## N. Y. SUPERIOR COURT.

### HERMAN STURM agt. THE GREAT WESTERN INSURANCE COMPANY.

The rule is, that if a vessel sink in ordinary sea-going weather, without any supervening cause of destruction, there must be some inherent defect or decay in or about the ship, and that she sank in consequence thereof, and that she was unseaworthy before she left port.

In negotiating a contract of insurance the parties are not upon a level, nor do they deal at arm's length. The insurer is presumed to be ignorant, and the insured informed, in respect to the subject to be insured; but reposes exclusively on the intelligence communicated by the insured. The parties occupying this unequal position, the law exacts of the party holding the position of advantage the utmost good faith and candor in communicating the facts affecting the risk. And the responsibility of the insured is proportioned to his obligation; so that, being in duty bound to disclose whatever may be material to the hazard, or may enter as an element in the estimate of the premium, if he consciously withhold any such material fact the contract is vitiated in its origin, and he can never recover on a contract, which is the offspring of his own fraudulent concealment.

Whether in an action upon contract or in tort, the plaintiff is forever precluded from recovery the moment it appears his own wrong or negligence is involved in the injury of which he complains.

The value of the thing insured is obviously and essentially material, as well to the risk run, as to the indemnity to be paid; and if the insured knowingly exaggerate that value and the insurer rely upon the statement of such excessive value in entering into the contract, the former loses all right to legal redress.

*Trial Term, January,* 1871.

THE facts are sufficiently stated in the opinion of the court.

Mr. PARSONS, *for plaintiff.*
Mr. CHOATE, *for defendant.*

McCUNN, J.—This is one of the most extraordinary cases I have ever been engaged in trying—a case, the details of which, together with the examination of evidence, require

the strictest vigilance on the part of a court. Indeed, I have been more vigilant in my attention to its details than I am ordinarily, for the reasons that cases of a similar kind have been tried by some of my brethren and they pursued a different course to the one I am about to take. Perhaps the evidence in this case is much stronger against the plaintiff's recovery than in the other cases. Of this I know not, but one thing I do know, that the proof, as far as it has gone, has revealed to my mind, to say the least, a most singular state of facts, and which show upon their surface such a condition of affairs as will not warrant me in allowing the jury to pass upon them.

The plaintiff alleges that he was the agent for the Mexican Government and was engaged in the purchase of arms, and, as a venture on his own behalf after the close of the war in Mexico (1867), he loaded a schooner of 160 or 170 tons burden.

The mate testifies, he receipted for a large number of boxes, and the stevedore says he put them in the hold of the ship; he and the mate did not see the contents of the boxes —indeed, no one has testified to the contents of the boxes.

The plaintiff says, he bought $35,000 of the goods from an itinerant broker named Mullen, and paid cash for them, paid for them in greenbacks, not in checks; that he paid him $10,000 of this sum in advance; that he kept no books in this case, but had done so in every other transaction with the world; he says Mullen had no place of business; has none now, but is wandering about, plaintiff knows not where; indeed, it is clear that he is a man of no account, and, to my mind, the very last in the world to have the possession of goods to the extent of thirty-five or forty thousand dollars, and, to say the least, the whole of plaintiff's statement about the purchase from Mullen is very improbable. Then, again, the plaintiff says that excepting the moneys he so mysteriously paid in bills to Mullen out

of a cargo valued at $213,000, he only had paid about $500 in cash, the balance of the goods being all paid for in Mexican bonds at sixty cents on the dollar.

Out of all this extensive cargo, and out of the vast number of boxes which must necessarily be required to contain such vast quantities of equipments and accoutrements for armies, not a single respectable firm in this city is shown to have sent a single package.

Now, as to the plaintiff's own statement to the under writers, he says he did not acquaint them that the valuation which he put upon these goods—and which were enormously overvalued—was based on the value of Mexican bonds' at sixty. In his book which he publishes he shows that these bonds were worth about ten or fifteen cents on the dollar, and yet he says he had freighted a schooner; two thirds of her large cargo ($213,000) had been paid for in these bonds, valued at sixty cents. All this was concealed from the company. Not only that, but there has not been shown yet in this case that there has been ten thousand dollars' worth of valuable goods, all put together, that went on board of this vessel.

It has been testified to that large numbers of boxes came there mysteriously, no one could tell from where. They were placed in the ship's hold and coal thrown over them, and I am asked to believe that they contained arms and munitions of war, and I am required to allow the jury to believe they contained quantities of such material. I decline to believe it. Again, the evidence of the captain and the first officer of the ship shows the vessel to have been entirely unseaworthy when she left this port. The vessel was purchased, as plaintiff alleges, for $4,000, to carry to Mexico a valuable freight worth $213,000, and then the account of the voyage given by the mate and captain shows that no rough weather during the trip was experienced, yet the schooner's butts were started and she went apparently down from her own inherent weakness.

Now, the rule is, that if a vessel sink in ordinary sea-going weather, without any supervening cause of destruction, there must be some inherent defect or decay in or about the ship, and that she sank in consequence thereof, and that she was unseaworthy before she left port. (*Walsh* agt. *Washington Ins. Co.*, 3 *Robts.*, 202.)

In negotiating a contract of insurance the parties are not upon a level, nor do they deal at arm's length. The insurer is presumed to be ignorant, and the insured informed, in respect to the subject to be insured. Hence, in forming the contract, the insurer, except he undertake to inquire for himself, does not rely on his own resources, but reposes exclusively on the intelligence communicated by the insured. And hence, further, the parties occupying this unequal position, the law exacts of the party holding the position of advantage, *i. e.*, the insured, the utmost good faith and candor in communicating the facts affecting the risk. So it is the contract of insurance is characterized, in legal language, as a contract *uberrimæ fidei.* And the responsibility of the insured is proportioned to his obligation; so that, being in duty bound to disclose whatever may be material to the hazard, or may enter as an element in the estimate of the premium, if he consciously withhold any such material fact the contract is vitiated in its origin, and he can never recover on a contract which is the offspring of his own fraudulent concealment. This rule is not only the dictate of morality, but is in harmony with all the analogies of the law (*Phillips on Insurance*, § 535, *et seq*).

Whether in an action upon contract or in tort, the plaintiff is forever precluded from recovery the moment it appears his own wrong or negligence is involved in the injury of which he complains.

The value of the thing insured is obviously and essentially material, as well to the risk run, as to the indemnity to be paid; and if the insured knowingly exaggerate that value, and the insurer rely upon the statement of such

Sturm agt. Gt. Western Ins. Co.

excessive value in entering into the contract, the former loses all right to legal redress.

In proportion as the insured over-estimates the value of the thing insured is he tempted to relax those precautions for its protection on which the insurer relies for his safety. And this is presenting the proposition in the least effective aspect; for it might well be declared a presumption of law that he who designedly and egregiously over-estimates the value of the property which he insures does so with some sinister purpose.

The books, I am aware, do not reckon an over-valuation among the misrepresentations which *ipso facto* avoid a policy. Nor should a casual or unimportant or honest over-valuation avail to deprive of all redress. But when the over-valuation, as in the case on trial, is designed, and is not only intentional but is out of all proportion beyond the cost, the actual and the market value, I hold that as well the law as public policy requires that such over-valuation should be deemed a conclusive presumption of fraud—of fraud which vitiates and annuls the contract. To hold that, notwithstanding such deliberate and flagrant over-valuation, the insured may yet recover according to the true value, would be to enable him to realize an inordinate indemnity if not detected in his fraud, or if detected then to obtain compensation in conformity to an honesty of measure which he himself repudiated in the beginning.

The plaintiff himself having avowed that he knowingly caused the goods in controversy to be insured at a figure enormously beyond their cost price and enormously beyond their actual and their market value, has no claim for relief which a court of justice can recognize and enforce.

The nonsuit must be ordered.